DECISION AND JOURNAL ENTRY
{¶ 1} Appellant/Cross-Appellee, Jennifer Wohleber ("Wife"), appeals from the judgment of the Lorain County Court of Common Pleas, Domestic Relations Division, granting the parties' divorce and classifying certain property at issue in the parties' divorce proceeding. Appellee/Cross-Appellant, Lawrence Wohleber, Jr. ("Husband"), appeals from the trial court's order, classifying the parties' joint checking account as marital property and ordering him to pay Wife half of the funds contained therein. This Court affirms in part and reverses in part.
 I {¶ 2} Husband and Wife were married on October 14, 2001 and separated in March 2004. Prior to their separation, the parties occupied multiple residences. From the date of the marriage until May 2002, Husband and Wife lived at a Main Street property in North Ridgeville. After they sold the Main Street residence, the parties moved to a Lear Nagle Road residence, owned by Husband's mother, Maxine Wohleber ("Mother"), in North Ridgeville. Mother *Page 2 
deeded the Lear Nagle residence to Husband and Wife, and in exchange, Husband and Wife satisfied Mother's remaining mortgage and purchased her a lot on Jaycox Road in Avon Lake. In November 2003, Husband and Wife sold the Lear Nagle residence and purchased a residence in Wellington. The deed for the Wellington residence gave Husband and Wife a one-half interest in the property and gave the other one-half interest to Mother. After the separation, Wife moved to her parents' home and Husband continued to reside at the Wellington residence.
 {¶ 3} On April 1, 2004, Husband filed for divorce. Wife filed a counterclaim for divorce, spousal support, and custody of the couple's child, who was scheduled to be born in September 2004. In January 2006, Mother joined the suit as a new-party defendant due to her ownership interest in the Wellington residence. Mother filed a counterclaim against Husband and a cross-claim against Wife to identify and protect her interests in the real property. The matter proceeded to a bench trial on June 12, 2006.
 {¶ 4} On August 10, 2006, the trial court issued a judgment entry of divorce. Wife filed a notice of appeal in this Court. On August 8, 2007, this Court dismissed Wife's appeal for lack of a final, appealable order. See Wohleber v. Wohleber, 9th Dist. No. 06CA009018,2007-Ohio-3964 (dismissing because judgment entry of divorce did not address the parties' joint checking account). The parties briefed the issue upon remand, and on April 17, 2008, the trial court deemed the remaining property, the parties' joint checking account, marital property and determined that Wife was entitled to half of the funds that had been in the account prior to Husband's closing it on May 14, 2004.
 {¶ 5} Both Wife and Husband have appealed from the trial court's decision. This Court consolidated the two appeals, consisting of Wife's four assignments of error and Husband's single assignment of error. *Page 3 
 II Wife's Assignment of Error Number One "THE TRIAL COURT ERRED BY CHARACTERIZING THE ENTIRE T-BILL ACCOUNT AS SEPARATE PROPERTY RESULTING IN AN INEQUITABLE DIVISION OF PROPERTY."
 {¶ 6} In her first assignment of error, Wife argues that the trial court erred when it classified the parties' T-Bill account as the separate property of Husband and awarded him all the funds and assets obtained from that account. Specifically, Wife argues that the trial court should have considered the entire T-Bill account marital property as of June 4, 2002 because: (1) Husband permitted marital funds to commingle with his separate funds in the T-Bill account as of that date; and (2) Husband failed to meet his burden in the court below by adequately tracing his separate property. We agree.
 {¶ 7} "The characterization of property as either marital or separate is a factual inquiry, and we review such characterization under a manifest weight of the evidence standard." Morris v. Morris, 9th Dist. No. 22778, 2006-Ohio-1560, at ¶ 23, citing Boreman v. Boreman, 9th Dist. No, 01CA0034, 2002-Ohio-2320, at ¶ 7-8. As such, we will affirm the trial court's characterizations if they are supported by competent, credible evidence. Morris at ¶ 23, citing Boreman at ¶ 7. In applying the foregoing standard, this Court recognizes its obligation to presume that the trial court's factual findings are correct and that while "[a] finding of an error in law is a legitimate ground for reversal, [] a difference of opinion on credibility of witnesses and evidence is not."Calame v. Treece, 9th Dist. No. 07CA0073, 2008-Ohio-4997, at ¶ 15, quoting Seasons Coal Co., Inc. v. Cleveland (1984), 10 Ohio St.3d 77,81.
 {¶ 8} Wife first argues that the mere commingling of the parties' marital funds with Husband's separate funds transformed all of the funds into marital funds. This Court has *Page 4 
recognized, however, that the mere "commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property [unless] the separate property is not traceable." Hirt v. Hirt, 9th Dist. No. 03CA0110-M, 2004-Ohio-4318, at ¶ 19, quoting R.C. 3105.171(A)(6)(b). Accordingly, the focus of the inquiry is whether the separate property is traceable. Hirt at ¶ 19. "The party seeking to have the commingled property deemed separate has the burden of proof, by a preponderance of the evidence, to trace the asset to his or her separate property." Id., citing West v. West, 9th Dist. No. 01CA0045, 2002-Ohio-1118 at ¶ 11-12. The only issue, then, is whether the record contains competent, credible evidence that Husband satisfied his burden to trace his separate property in the T-Bill account.
 {¶ 9} With regard to the T-Bill account, the trial court determined that:
 "15. In December, 2000, [Husband] received, as a settlement of the wrongful death claim of his deceased father, the sum of $90,000 that he deposited into a T-Bill account ending in 0964. In March, 2001, he deposited into that account his tax refund from the calendar year 2000 in the amount of $1,651.90. In November, 2001, he added to that account money he received from the liquidation of his Public Employees Retirement Account. In May, 2002, he deposited into the T-Bill account the proceeds from the sale of his residence on Main Street. The Court finds the funds deposited into the T-Bill account to be the separate property of [Husband].
 "***
 "37. The Court finds that [Wife] withdrew, in March 2004 from [Husband's] T-Bill account the sum of $15,000 and that the same was the separate property of [Husband]. [Wife] owes to [Husband] the sum of $15,000.
 "38. The monies withdrawn from the T-Bill account in the amount of $12,376 by [Husband], that closed the account, were his separate property."
Wife argues that the trial court's determination that Husband met his burden in tracing his separate funds is not based on competent, credible evidence because: (1) the trial court did not account for the $55,686.81 in marital funds that the parties placed in the T-Bill account after they refinanced the Lear Nagle residence; and (2) simple math reveals that the total amount that the *Page 5 
parties withdrew from the T-Bill account exceeds the total amount of separate assets that Husband deposited in the account such that Husband must have exhausted his separate funds at some point and delved into the marital funds without accounting for it.
 {¶ 10} Husband does not deny that the parties deposited $55,686.81 into the T-Bill account when they refinanced and acquired the Lear Nagle property.[1] He argues that the deposit is irrelevant because, within two months of the deposit, the parties transferred $60,000 to their joint-checking account and spent it on family purchases. He avers that "[t]he account's entire history, from the date of opening until the date of closing, March 25, 2004, was completely traced for the Trial Court, and submitted as [Wife's] Exhibit `X.'"
 {¶ 11} Exhibit X indicates that the parties deposited $55,686.81 in the T-Bill account on June 4, 2002. The Exhibit describes the deposit as follows: "[Husband] and [Wife] refinanced 5194 Lear Nagle ($100,000 mortgage — paid off existing mortgage in [Mother's] name *** and deposited remaining into T-bill[)]." The trial court's order, however, indicates that:
 "18. [Husband] and [Wife] refinanced the mortgage on the Lear Nagle Road property. They borrowed approximately $100,000 from which they paid off the mortgage on the real estate in the amount of approximately $45,000 and deposited the balance into their joint account. From these proceeds the Parties paid off two student loans of [Wife] in the approximate amount of $30,000." (Emphasis added.)
Apart from the fact that a $30,000 payment on Wife's student loans would still leave $25,000 of the original $100,000 unaccounted for, the trial court indicated that the parties placed the money *Page 6 
remaining from their refinancing "into their joint account." The remainder of the court's judgment entry refers to the T-Bill account as the "T-Bill account." Accordingly, it would appear that the trial court mistakenly determined that the parties had placed the $55,686.81 remaining from the refinancing into their joint-checking account, which the court later determined to be marital property.
 {¶ 12} Moreover, the remainder of Exhibit X belies the conclusion that Husband traced his separate property. Prior to the June 4, 2002 deposit of the $55,686.81 from the parties' refinancing, the T-Bill account had a balance of $45,682.92. Wife concedes that this money was Husband's separate property. When the parties' deposited the $55,686.81 on June 4, 2002, the T-Bill account balance increased to $101,369.73. Exhibit X reflects that Husband withdrew a total of $75,220 in varying amounts from June 22, 2002 to January 25, 2003[2] As such, Husband withdrew more than the $45,682.92 that the T-Bill account contained before June 4, 2002, but less than the $101,369.73 that the account contained after the parties' $55,686.81 deposit. Husband's withdrawals do not bear any specific relation to the $55,686.61 deposit. The withdrawals were for whole amounts and were taken in varying increments. Further, the interest amounts deposited in the T-Bill account only bear relation to the account's total balance. Exhibit X does not differentiate between the interest gained on Husband's separate property versus the interest gained when the parties' added the $55,686.81 to the account. *Page 7 
 {¶ 13} Based on all of the foregoing, we cannot conclude that the record contains competent, credible evidence in support of the trial court's conclusion that Husband traced his separate property and that the entire T-Bill account was Husband's separate property. Marital funds were added to the T-Bill account on June 4, 2002 and commingled with the funds contained therein. Husband failed to trace his separate property as of that date. The record reflects that both Wife and Husband separately withdrew funds from the T-Bill account in March 2004 when the parties' separation occurred. Husband filed for divorce ten days after he and Wife withdrew funds from the T-Bill account and Husband closed the account. Upon remand, the trial court must determine what funds, if any, the parties owe to one another as a result of the T-Bill account being classified as marital property from June 4, 2002 until its closing on March 22, 2004. See Berish v. Berish (1982), 69 Ohio St.2d 318, syllabus (providing that trial court has discretion to base award of parties' joint savings account, which was accumulated during the marriage, on the date of the parties' permanent separation rather than a later date). Wife's first assignment of error has merit.
 Wife's Assignment of Error Number Two "THE TRIAL COURT ERRED IN FAILING TO FIND THAT HUSBAND'S MOTHER GIFTED THE LEAR NAGLE PROPERTY TO HUSBAND AND WIFE[.]"
 {¶ 14} In her second assignment of error, Wife argues that the trial court erred in concluding that Mother did not give her Lear Nagle property to Husband and Wife as a wedding gift. Specifically, Wife argues that Mother intended to relinquish her interest in the Lear Nagle home when she transferred its title to Husband and Wife by quit-claim deed. We disagree.
 {¶ 15} As in Wife's first assignment of error, this Court will affirm the trial court's determination if the record contains competent, credible evidence in support of that *Page 8 
determination. Morris at ¶ 23. Once again, we recognize our obligation to presume that the trial court's factual findings are correct.Calame at ¶ 15, quoting Seasons Coal Co., Inc., 10 Ohio St.3d at 81. We also are mindful of the fact that while "[a] finding of an error in law is a legitimate ground for reversal, [] a difference of opinion on credibility of witnesses and evidence is not." Calame at ¶ 15, quotingSeasons Coal Co., Inc., 10 Ohio St.3d at 81.
 {¶ 16} "A valid inter vivos gift requires that the donor (1) intends to make a gift of the property immediately, (2) effects a delivery of the property, and (3) relinquishes all control and dominion over the property." Modie v. Andrews (July 26, 2000), 9th Dist. No. 19543, at *3, citing Streeper v. Myers (1937), 132 Ohio St. 322, paragraph one of the syllabus. "The burden of showing that an inter vivos gift was made is on the donee by clear and convincing evidence." Smith v. Shafer (1993),89 Ohio App.3d 181, 183.
 {¶ 17} The trial court made the following determinations with regard to the Lear Nagle property:
 "17. *** In April, 2002, [Mother] transferred her interest in the property located at 5194 Lear Nagle Road, N. Ridgeville, Ohio to [Husband] and [Wife]. The Court does not find that [Mother] intended to relinquish her equitable interest in the property by her transferring the title to her son and his wife."
Wife argues that the trial court's determination is not supported by competent, credible evidence because numerous witnesses at trial testified that Mother orally expressed her intent to give Husband and Wife the Lear Nagle property as a wedding gift.
 {¶ 18} Mother transferred the Lear Nagle property to Husband and Wife by quit-claim deed in April 2002. At the time, Mother still had a $45,000 outstanding mortgage on the Lear Nagle property. Husband and Wife obtained $100,000 through refinancing and satisfied Mother's outstanding mortgage when she transferred the property to them. Husband and Wife *Page 9 
also purchased a $45,000 lot for Mother on Jaycox Road and paid approximately $15,000 in taxes on Mother's behalf that resulted from the sale of her tavern.
 {¶ 19} Mother testified that she did not intend to gift the Lear Nagle property to Husband and Wife. Mother testified that she deeded the property to Husband and Wife because they agreed to help her financially and because she wanted the Lear Nagle property to remain under family ownership. Mother asserted that she was not in a financial position to simply "give [her] house away."
 {¶ 20} Neither the testimony of Wife's mother, Georgia Wharton, nor the testimony of her father, Richard Wharton, contradicted Mother's assertions. Georgia testified that Wife had advised her that Mother was deeding the Lear Nagle property to Wife and Husband in consideration for their satisfaction of Mother's mortgage as well as for the payment of Mother's taxes and the purchase of Mother's new lot on Jaycox Road. Accordingly, Georgia's testimony supported the conclusion that Wife did not consider the Lear Nagle property to be an outright gift. Further, Richard only testified that he had heard Mother say that "she wanted [Husband and Wife] to have the house." Even if Mother had sold the Lear Nagle property to Husband and Wife, they still would have "ha[d] the house."
 {¶ 21} Wife argues, however, that Mother admitted at trial that she had gifted the Lear Nagle property to Husband and Wife. Wife's brief provides that: "Husband's Mother, when asked what did she give Husband and Wife for their wedding responded: `Actually, I was sitting at the wedding and I said, well, I did not get them a gift because I am quit-claiming a deed to the house to them. . . .'" Mother's complete answer, however, provides that:
 "Actually, I was sitting at the wedding and I said, well, I did not get them a gift because I am quit-claiming a deed to the house to them, and I did not get them a wedding present. My intention was to have a party for them" (Emphasis added.) *Page 10 
It is unclear whether Mother meant that: (1) the Lear Nagle property was her gift to Husband and Wife and that she was not purchasing them a wedding present in addition to that gift; or (2) the party she intended to throw would be her only gift to the couple. Even if Mother did not intend the Lear Nagle property as a gift, she could have thought that Husband and Wife were benefiting from the ownership of the home and that the benefit justified her not buying the couple a wedding present. Either way, Mother's answer was ambiguous at best, and the trial court was in the best position to judge the credibility of the witnesses. SeeCalame at ¶ 15, quoting Seasons oal Co., Inc., 10 Ohio St.3d at 81. The trial court's determination that Mother did not gift the Lear Nagle property to Husband and Wife and intended to retain an equitable interest is supported by competent, credible evidence. Wife's second assignment of error lacks merit.
 Wife's Assignment of Error Number Three "THE TRIAL COURT ERRED IN DETERMINING THAT MAXINE WOHLEBER HAS AN EQUITABLE AND LEGAL INTEREST IN THE WELLINGTON PROPERTY AMOUNTING TO FIFTY PERCENT (50%) OF THE EQUITY."
 {¶ 22} In her third assignment of error, Wife argues that the trial court erred in determining that Mother has a 50% interest in the Wellington property. We disagree.
 {¶ 23} We incorporate the standard of review set forth in assignment of error number two. As such, we must determine whether the trial court's determination is supported by competent, credible evidence.Morris at ¶ 23.
 {¶ 24} The trial court determined the following with regard to the Wellington property:
 "20. The Lear Nagle Road property was sold in November, 2003, for Two Hundred Twelve Thousand Dollars ($212,000). The mortgage was paid with the proceeds and the balance of the monies was used as a down payment on the property located at 39481 State Route 18, Wellington, Ohio. *Page 11 
 "21. The Wellington property is encumbered by a loan with First Federal of Lakewood in the name of [Husband] and [Wife] in the amount of $197,000. The property has a fair market value of $307,000 ***.
 "22. The property in Wellington, Ohio is titled to [Husband] and [Wife], in a one-half, jointly owned interest, and another one-half, undivided interest, titled to [Mother]. *** The Court finds that by clear and convincing evidence the Parties intended that the property be jointly owned with [Mother], and that she has an equitable and a legal interest in the property. [Mother] has contributed economically to the real estate. She has made some of the mortgage payments and has invested money in repairs and remodeling of the home.
 "23. The equity in the property is approximately One Hundred Ten Thousand Dollars ($110,000). Fifty percent (50%) of the equity belongs to [Mother] and Fifty percent (50%) of the equity belongs to [Husband] and [Wife]. The value of the interest owned by [Husband] and [Wife] is $55,000. Each party is entitled to $27,500 of equity in the real estate."
Wife argues that the trial court erred in reaching these conclusions because the parties never intended for Mother to have a lasting interest in the Wellington property. According to Wife, the parties only intended for Mother's name to remain on the Wellington deed if she sold her Jaycox Road property and came to live with them or otherwise built some type of addition onto the Wellington property in which to live.
 {¶ 25} The survivorship deed to the Wellington property grants a one-half, undivided interest to Mother. When questioned at trial about the effect of Mother's name being included on the Wellington deed, Wife testified as follows:
 "Q: What did you think that meant?
 "A: I knew that she was going to have equity in it, but I did not know it was going to be one-half, I guess."
Furthermore, a concurrency addendum to the parties' purchase agreement for the Wellington property indicates that a prerequisite to the purchase of the Wellington property was the sale of either the Lear Nagle property or Mother's Jaycox Road property. Mother agreed to sell her property to secure the purchase of the Wellington property. Wife conceded that Mother bound *Page 12 
herself to the parties' purchase agreement on the Wellington property and agreed to sell her own home so that Husband and Wife could have the opportunity to purchase the Wellington property. Moreover, the record contains evidence that Mother paid for improvements to the Wellington property and helped pay the mortgage on the property when Wife moved out to live with her parents. The fact that Wife did not appreciate the legal significance of all of these items does not detract from the existence of a property interest on Mother's part. The record contains competent, credible evidence that the parties gave Mother a one-half interest in the Wellington property. Wife's third assignment of error is overruled.
 Wife's Assignment of Error Number Four "THE TRIAL COURT ERRED IN TREATING 100% OF WIFE'S STOCK OPTIONS AS MARITAL AND ERRED IN ITS VALUATION."
 {¶ 26} In her fourth assignment of error, Wife argues that the trial court erred in concluding that she owned 850 shares of stock, classifying all of her 850 stock options as marital property, and assigning a value of $6.79 to each of the stock options. We agree in part.
 {¶ 27} In determining whether the trial court erred in classifying Wife's stock interests as marital property, this Court must look to whether the record contains competent, credible evidence in support of the trial court's decision. Morris at ¶ 23, citing Boreman at ¶ 7. The valuation of any stock interests, however, is a factual matter subject to a court's discretion. See Saluppo v. Saluppo, 9th Dist. No. 22680,2006-Ohio-2694, at ¶ 52. "[A] trial court is not required to choose one particular method of valuation over another in valuing marital assets." Id., citing Focke v. Focke (1992), 83 Ohio App.3d 552, 556. Consequently, we must affirm a trial court's valuation unless the facts and circumstances indicate that the court abused its discretion in making the valuation. Saluppo at ¶ 52. The phrase "abuse of discretion" connotes *Page 13 
more than an error of judgment; rather, it implies that the trial court's attitude was arbitrary, unreasonable, or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 28} The trial court determined the following with regard to Wife's stock options:
 "28. [Wife] further has 850 shares of Ford stock, acquired on March 15, 2002. The value of the stock at trial was $6.79 per share. The total value of [Wife's] stock is Five Thousand Seven Hundred Seventy One Dollars and Fifty Cents [(]$5,771.50). This is a marital asset."
The trial court ordered Wife to pay half of this amount to Husband as part of the parties' marital estate. Before turning to the issue of valuation, we first consider whether the court erred in classifying all 850 stock options as marital property.
 {¶ 29} Wife testified at trial that she possessed 850 stock options through her employment at Ford Motor Company. Wife specified that 500 of her stock options were granted in March 2001 and the remaining 350 were granted in March 2002. Wife also introduced an account summary of her stock options at trial. The account summary verified that Wife received 500 stock options on March 9, 2001 and 350 stock options on March 15, 2002. Husband did not challenge the foregoing evidence. Nor does he challenge this evidence on appeal. His argument only pertains to the valuation of the stock options. Further, no one disputes that the parties were married on October 14, 2001. Accordingly, Wife demonstrated that she received 500 of her 850 stock options before the parties were married. The trial court's determination, that Wife received all 850 of her stock options on March 15, 2002 and that all of those options were marital property, is not supported by competent, credible evidence. Wife's premarital 500 stock options were her separate property. As to the remaining 350 stock options, the record supports a finding that Wife acquired those options during the marriage. Consequently, the record contains competent, credible evidence that 350 of Wife's stock options were marital property. *Page 14 
 {¶ 30} The trial court valued Wife's stock options based on the present value of the stock, which amounted to $6.79 per share. Wife testified at trial that the 350 stock options that she acquired on March 15, 2002 permitted her to purchase stock at a price of $16.91 per share. Wife further testified that, because the current value of the stock was only $6.79 per share, she had not exercised any of her options. Accordingly, we must determine whether the trial court abused its discretion in valuing Wife's unexercised stock options at the present value of the stock.
 {¶ 31} Wife's argument on appeal as to valuation is limited to the following:
 "The trial court also erred in assigning the value of $6.79 per option. If an individual has the right to purchase a share of stock for [$16.91] when the stock is actually valued at $6.79, we submit to this Court that the option has no value."
The fact that a stock option has a negative value at the time of a divorce does not automatically mean that the stock option is valueless. "[T]he true value of stock options lies in their future exercise *** [and] the potential for appreciation in stock price without investment risk." Rice v. Montgomery (1995), 104 Ohio App.3d 776, 780. Accordingly, the trial court did not err in assigning some value to Wife's stock options because even a currently worthless option has the potential for future value. Husband was entitled to his marital share of any potential future value in the 350 stock options that Wife acquired during the marriage.
 {¶ 32} Wife fails to cite any law in support of her argument that the trial court abused its discretion in valuing her stock options. Moreover, Wife limited her argument in the trial court to the same argument that she forwards on appeal: that her stock options were worthless. Neither party presented any evidence of valuation at trial beyond the current value of Ford Motor Company's stock. This Court recognizes that "[quantifying the value of a stock option at the time of its grant is a complex task, subject to the vagaries of market forecast and compounded by *Page 15 
the fact that no ready market can exist for nontransferable stock options." Id. at 781. Yet, we will not formulate an argument on Wife's behalf. See Cardone v. Cardone (May 6, 1998), 9th Dist. No. 18349, at *8 ("If an argument exists that can support this assignment of error, it is not this court's duty to root it out."). We will not conclude that the trial court abused its discretion in valuing Wife's stock options when she presents no authority for our doing so and when the trial court based its decision upon the only valuation evidence introduced at trial. The trial court determined that Husband was entitled to half the value of the marital stock options, which it determined to be $6.79 per option. Based on our conclusion that 350 of Wife's stock options were marital property, Wife's options were worth $2,376.50. Accordingly, Husband was entitled to $1,188.25, half of the total value of the 350 marital stock options.
 {¶ 33} To the extent that Wife argues that the trial court erred in classifying all 850 of her stock options as marital property, her assignment of error is sustained. Only 350 of Wife's stock options constitute marital property. To the extent that Wife argues that the trial court erred in valuing her stock options, her assignment of error is overruled. Husband is entitled to half of the $6.79 per option value of Wife's 350 post-marital stock options for a total award of $1,188.25.
 Husband's Assignment of Error "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN ORDERING THE APPELLEE TO PAY ADDITIONAL FUNDS FROM AN ASSET WHICH DID NOT EXIST AT THE TIME OF TRIAL."
 {¶ 34} In his sole assignment of error, Husband argues that the trial court erred in classifying the parties' joint checking account as marital property because the account no longer existed at the time of trial. We disagree. *Page 16 
 {¶ 35} The trial court determined the following with regard to the parties' joint checking account:
 "[T]he Court finds that the monies in the [joint] checking account at First Federal of Lakewood *** in the amount of $15,154.62 was marital property. As such, [Wife] is entitled to one half of those funds, which were withdrawn by [Husband] and deposited into a separate account in his name after the parties had separated. IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that [Husband] pay to [Wife] the sum of $7428.72, which represents [Wife's] share of the marital property as set forth hereinabove."
 {¶ 36} Husband does not argue that Wife never had an interest in the parties' joint checking account. He concedes that Wife's name was added to the account after the parties married and that she deposited her paychecks into the account during the course of the marriage. Instead, Husband argues that the trial court "had no obligation to divide an asset that did not exist at the time of trial." As such, the only issue is whether the trial court erred in determining that the joint checking account was subject to classification as either marital or separate property.
 {¶ 37} Husband testified that he removed the funds remaining in the parties' joint checking account after the parties' separation. He further admitted that he transferred these funds to his personal checking account. Accordingly, the parties' joint checking account no longer existed at the time of trial because Husband removed the remaining funds, transferred them to his own bank account, and closed the joint checking account a month before he filed for divorce. We cannot conclude that the trial court erred in concluding that the funds Husband transferred to his personal account were subject to classification in the divorce proceeding. If we were to conclude otherwise, a spouse could defeat the possible distribution of certain assets simply by disposing of the assets prior to trial. Consequently, Husband's sole assignment of error lacks merit. *Page 17 
 III {¶ 38} Wife's first assignment of error is sustained, her second and third assignments of error are overruled, and her fourth assignment of error is sustained in part and overruled in part. Husband's sole assignment of error is overruled. The judgment of the Lorain County Court of Common Pleas, Domestic Relations Division, is affirmed in part, reversed in part, and remanded to the trial court for further proceedings consistent with the foregoing opinion.
Judgment affirmed in part, reversed in part, and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
[1] When Mother deeded the Lear Nagle property to Husband and Wife, Mother still had an outstanding balance of approximately $45,000 on the home's mortgage. Husband and Wife refinanced $100,000, satisfied Mother's mortgage, and placed the remaining funds in the T-Bill account.
[2] Husband withdrew the following amounts: (1) on June 22, 2002, he transferred $20,000 to the parties' joint checking account; (2) on June 29, 2002, he transferred $30,000 to the parties' joint checking account; (3) on August 9, 2002, he transferred $10,000 to the parties' joint checking account; and (4) on January 25, 2003, he withdrew $10,220 to place a down payment on an apartment building.
Costs taxed equally to both parties. *Page 18 
CARR, J. CONCURS